## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| **STRYKER SALES CORPORATION**, a | ) | |
| Michigan corporation, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | The Honorable _____ |
| v. | ) | |
| | ) | |
| **JOHNNY MCNANY**, an individual; and | ) | |
| **INTEGRA LIFESCIENCES CORPORATION**, | ) | |
| a Delaware corporation; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, STRYKER SALES CORPORATION ("Stryker Sales"), for its Complaint for Injunctive and Other Relief against Defendants, JOHNNY MCNANY ("McNany") and INTEGRA LIFESCIENCES CORPORATION ("Integra") (collectively "Defendants"), states as follows:

## INTRODUCTION

1.      For almost a decade, McNany was employed by Stryker Sales in the "South Bay" area of California as a Sales Representative selling products and services for the Neurosurgical, Spine & ENT business unit ("Stryker NSE") of Stryker Instruments, a Division of Stryker Corporation.  (Hereinafter, Stryker Sales, Stryker Corporation, Stryker Instruments and Stryker NSE will be collectively referred to as "Stryker.").  McNany sold the entire line of NSE products, including the Sonopet® Ultrasonic Aspirator System ("Sonopet").  Sonopet is a state-of-the-art-medical device that allows surgeons to reach and remove cancerous tumors, typically in the cranial area.  The cost of a Sonopet is substantial and requires a capital contribution of hundreds of thousands of dollars for the actual equipment and the disposable products that are

specifically designed to be used with the Sonopet.

2.      Since mid-2014, McNany had been working closely with one of Stryker's long-term customers in the South Bay Area territory -- the hospitals, medical centers and clinics affiliated with Stanford University, including Stanford University Hospital ("Stanford Hospital") and Lucile Packard Children's Hospital ("Stanford Children's") (collectively, "Stanford Medical Center") -- on a project involving a lengthy in-hospital trial of the Sonopet.   As a result of this project, Stanford Medical Center is on the verge of purchasing at least two Sonopets.  Stanford Children's indicated its intention to do so by the end of the year and  Stanford Hospital indicated that it would make a decision even sooner, by September 30, 2015.  A few months before the expected sale to Stanford Children's and just fifteen days before the expected sale to Stanford Hospital, McNany suddenly resigned to join Integra.  Integra is Stryker's main competitor in the ultrasonic aspirator product marketplace.  Integra manufactures and sells a competing ultrasonic aspirator known as the CUSA EXcel® System ("CUSA").  Stanford Medical Center currently owns older CUSAs in its facilities.

3.      Stryker stands to benefit from Stanford Medical Center's purchase of Sonopets both regionally and nationally given Stanford's prestige in the medical community and, particularly, in neurology and neurosurgery.  McNany and Integra are seeking to interfere with this sale using unjustified means and unfair methods of competition.  McNany, with Integra's knowledge and consent, has been violating his express contractual post-employment obligations to Stryker, which prohibit contacting or soliciting McNany's former customers or prospects.  Specifically, McNany has been calling on Stanford Medical Center and attempting to persuade it to purchase new CUSAs and expensive upgrades to the existing CUSAs instead of the Sonopet, with full knowledge of the Sonopet Project and the expected purchase dates.  As a result, both

2

Stanford Hospital and Stanford Children's have delayed their purchasing decisions regarding the Sonopet. McNany has also been gaining access to Stanford Hospital using Stryker's name and, on information and belief, the credentials he acquired while at Stryker.

4.     Absent intervention by the Court, Defendants' improper activity will cause irreparable harm to Stryker's collaboration with Stanford Medical Center on the Sonopet, Stryker's sale of Sonopets and associated disposables to Stanford Medical Center, its other hard-earned and long-term customer relationships, and its goodwill.  McNany and Integra must be enjoined as Stryker has no adequate remedy at law.

## PARTIES

5.     Stryker Sales is a wholly owned subsidiary of Stryker Corporation.  Stryker Instruments is a Division of Stryker Corporation.  Stryker NSE is a business unit of Stryker Instruments.  Stryker Sales is a corporation organized and existing under the laws of the State of Michigan, with its nerve center and principal place of business in Kalamazoo, Michigan.

6.     Integra is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Plainsboro, New Jersey.

7.     McNany was employed by Stryker Sales from July 2006 until he voluntarily terminated his employment on September 15, 2015.  He is domiciled in and a citizen of California.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as this is a civil action between citizens of different states and the amount in controversy exceeds $75,000.

9.     This Court has personal jurisdiction over Defendants, and venue is proper in this District under 28 U.S.C. § 1391(a) pursuant to the Stryker Sales Representative Confidentiality, Intellectual Property, and Non-Competition Agreement ( "Agreement"), through which McNany

3

consented to personal jurisdiction and venue in this Court, and because Integra has committed and continues to commit tortious acts that are related to and have caused harm to Stryker in Michigan, regularly conducts business in Michigan and is registered to do business in Michigan with the Michigan Secretary of State. Additionally, Stryker Sales' nerve center and principal place of business is in Kalamazoo, Michigan, and it regularly conducts business in Michigan.

10. Moreover, by hiring McNany, Integra must reasonably expect to be subject to jurisdiction and venue in this Court pursuant to the forum selection clause contained in the Agreement.

## EVENTS GIVING RISE TO THIS ACTION

### STRYKER'S BUSINESS

11. Stryker Instruments is a global leader in the development, manufacture and sale of, among other things, products in the treatment of neurologic, spinal, and ear/nose/throat ("ENT") conditions. Stryker NSE is a market leader in the neuro, spine and ENT surgical equipment marketplace.

### *Stryker NSE Products and Customers*

12. Stryker Instruments invents, designs, manufactures and sells a full range of state-of-the-art instruments and devices used in a wide variety of surgical procedures. These products make surgeries and recoveries simpler, faster and more effective. Stryker Instruments' products are sold in interstate commerce throughout the United States and elsewhere.

13. Among other things, Stryker NSE products assist doctors in performing surgeries to remove cancerous tumors. Stryker sells several different types of surgical equipment including, but not limited to, drills and cutting accessories, which allow surgeons to gain access to tumors; bone mills, which allow doctors to grind and repair bone; and Sonopet, which simultaneously allows doctors to control soft tissue and allow fine bone dissection so that the

4

surgeon can then ablate tumors.  Because such equipment is expensive and requires a large, up-front investment on the part of hospitals and medical centers, it is known in the industry as "capital equipment."

14.     In addition to capital equipment, Stryker also sells a wide range of disposable products that are designed to be used with its line of NSE capital equipment.

15.     The NSE device and products industry is highly competitive.  Stryker dedicates a significant amount of time and resources cultivating its customer relationships and creating goodwill amongst its customers by, among other things, providing a high level of customer service and offering them continual training on Stryker's state of the art products.  As a result, customers using Stryker products typically establish long-standing relationships with Stryker.

*Stryker NSE Sales Representatives*

16.     Stryker Instruments sells its NSE product line through sales representatives.  NSE device sales are highly dependent upon the relationships developed between the sales force and the surgeon customers because of the surgeon's reliance upon the sales representatives to provide technical assistance and detailed product information and support both during and following medical procedures.

17.     Stryker sales representatives provide technical product information and specifications, coordinate training for surgeons utilizing its products, and frequently "scrub-in" for surgical procedures to provide technical assistance and knowledge to the surgeons and medical staff.  As a result, sales representatives become the face of Stryker to its customers.  Thus, the role of a sales representative or a sales manager is more than simply "selling," *i.e.* discussing pricing, differentiating a competing product, etc.  These individuals meet with surgeons to show them Stryker's portfolio of products and speak to the products' capabilities,

5

and they are present during surgical procedures to provide technical assistance and knowledge regarding the safe and effective use of the products by the surgeons and medical staff. Over time, by demonstrating knowledge of the technical product information, specifications, and safe and effective uses, sales representatives gain their assigned surgeons' trust and confidence in Stryker and its products.

18. In order to provide this level of service, Stryker sales representatives spend significant time at their accounts to develop detailed knowledge of surgeon preferences, common procedures, and which Stryker products will best meet their needs. Indeed, as discussed more fully below, McNany was present at Stanford Medical Center several days a week.

### Stryker Representatives' Training and Access to Confidential Information

19. Training and access to Stryker's confidential, proprietary and trade secret information are critical to a sales representative's success.

20. Stryker makes substantial, continuous investment in the training and education of its sales force to ensure that the sales representatives and sales managers are equipped with comprehensive product information. These trainings take place in various forms and forums, including initial training for newly hired reps, weekly and monthly meetings, and at Stryker's annual and mid-year National Sales Meetings, where Stryker shares with the entire sales force confidential and proprietary information relating to its products, sales programs, and other company-wide strategies, including new product development, long and short-term strategic sales plans and other confidential competitive strategies.

21. Beyond training, the day-to-day functions of a sales representative require access to and use of confidential and proprietary strategic information. Specifically, in order to sell the NSE product line, McNany had access to confidential information concerning:

6

- Product acquisition and development in the NSE line of business;

- Customer retention strategies, including strategies that apply to Stanford Medical Center;

- Marketing plans and promotional strategies for all NSE products, including but not limited to the Sonopet;

- Pricing strategies, including terms and conditions of sales, profit margins, product pricing discounts, bulk purchase pricing for all NSE products, including Sonopet;

- Innovative and proprietary financing, leasing, and payment options for all NSE products, including the Sonopet; and

- Competitive strategies, including those against Integra.

22.    McNany was able to access all of this information through a password-protected website, which he often accessed on his iPhone and iPad.  As with all of its sales representatives, McNany is expected to use this information exclusively to enhance and promote Stryker's relationships with its surgeon and hospital customers.

**INTEGRA**

23.    McNany's new employer, Integra, is a medical device company and a direct competitor of Stryker in the NSE market.

24.    Integra sells a competing ultrasonic aspirator known as the CUSA.

25.    Integra also sells a variety of other competing products, including bone mills.

**MCNANY'S EMPLOYMENT WITH STRYKER**

26.    McNany was employed by Stryker Sales starting in July 2006 until he resigned on September 15, 2015 to work for Integra.

27.    McNany was hired by Stryker Sales as a Sales Representative selling products and services for Stryker NSE.  McNany's territory while at Stryker was known as the Bay Area South Territory ("Territory"), which includes San Jose, Santa Clara, Palo Alto, and Stanford. McNany was the exclusive Stryker NSE Sales Representative assigned to the Territory and held

this position for over nine (9) years, since the beginning of his employment.

28.     McNany's Territory covered approximately 65 hospitals and medical centers or "accounts."  McNany provided support, education, and training to each of these accounts for the full-line of Stryker NSE products.  In addition, McNany often scrubbed-in and was present for surgeries where Stryker NSE products were being used.  Before being able to enter the hospital on behalf of Stryker, McNany was required to undergo a credentialing process.

29.     All hospitals and medical centers require sales representatives and other vendors to become credentialed before permitting them access to certain areas of the hospitals, including surgical areas and purchasing.  There is no standard credentialing process that applies to every hospital.  Each hospital may have unique requirements and may rely on different third-party companies to verify a vendor's credentials.  In general, the credentialing process is expensive and time consuming because it requires vendors to submit to a background check; provide various documentation, such as immunization records and proof of product and/or liability insurance; undergo various training programs; and pay fees.

30.     The credentialing process is not only specific to each hospital, it is also specific to each vendor company.  A sales representative's credentials obtained while working for one company do not transfer if he or she leaves and accepts employment with another company.  Rather, the sales representative must go through the entire credentialing process again.

**STANFORD AND THE SONOPET PROJECT**

31.     Through his employment by Stryker Sales, McNany became credentialed to work at Stanford Medical Center.  Stanford Medical Center has been a Stryker customer for many years.  Stanford Medical Center was the biggest Stryker account assigned to McNany and represents a special opportunity for Stryker with regard to the Sonopet.

32.     Prior to his resignation, McNany, with others at Stryker, worked to introduce

8

Sonopet to Stanford Medical Center ("Sonopet Project").  Sonopets were placed in both Stanford Hospital and Stanford Children's on a trial basis, and Stryker was in the process of closing a deal with Stanford Hospitals for the sale of at least two Sonopets.  Each Sonopet costs in excess of $75,000. During the Sonopet Project, Stanford Medical Center also purchased disposables associated with using the Sonopet in excess of $75,000.

33.   At all times, McNany was Stryker's lead on the Sonopet Project.  McNany was involved in and responsible for all aspects of the Sonopet Project.  He was in the operating room at Stanford Medical Center several times each week and fielded calls from surgeons and administrators on days he was not physically present.  He was present for surgeries in which a Sonopet was used.  He provided surgeons with education and training regarding the equipment. He sold Stanford the disposable products specially designed for use with the Sonopet.  And he negotiated with Stanford Medical Center's administration regarding pricing for their ultimate purchase of Sonopets.

34.   As of September 15, 2015, the date on which McNany resigned to work for Integra, Stanford Medical Center was on the verge of purchasing at least two Sonopets.  Stanford Hospital communicated to Stryker that it had budgeted for the purchase and would issue a purchase order by the end of September 2015.  However, no purchase order has yet been received.

35.   In addition, Stanford Children's indicated that it would make a purchasing decision regarding the Sonopet in or around November 2015 but has since indicated that it will delay that decision to early 2016 to test new CUSA equipment being promoted by McNany.

36.   Should Stanford Medical Center purchase the Sonopets from Stryker, it would be highly beneficial to Stryker sales not only in the Bay Area South territory but nationwide.  Such

9

a purchase would signal to other hospitals and medical centers throughout the country that Sonopets are a high quality, cutting edge, and well-established ultrasonic aspirator in the NSE market.  It would also give Stryker the opportunity to expose all of the students and residents who train at Stanford Hospitals to the Sonopet, making it more likely that they will continue to acquire and use the Sonopet in their own practice.

37.     Integra would likely lose business at Stanford Medical Center and nationwide if Stryker's sale of Sonopets goes through.  Stanford Medical Center currently owns some older CUSA systems.  If Stanford Medical Center adds Sonopets to its inventory, it makes it less likely that Stanford Medical Center will upgrade its existing CUSA systems or purchase new ones. Integra and McNany clearly want to avoid losing sales at Stanford Medical Center and, more generally, they want to prevent the Sonopet from gaining traction in the market.

**MCNANY'S CONTRACTUAL OBLIGATIONS TO STRYKER**

38.     On July 25, 2006, McNany executed the Agreement, which contains certain reasonable post-employment contractual obligations owing to Stryker.  (A true and correct copy of the Agreement is attached as **Exhibit A**.)

39.     McNany received continued employment and compensation, access to and receipt of Stryker's trade secrets and confidential information, and substantial training in exchange for his execution of the Agreement.  Pursuant to the Agreement, McNany recognized that Stryker has legitimate interests in protecting its confidential and proprietary information, its technologies, products and services, and its customer relationships.  (*Id.* § 5.6).

40.     The Agreement defines "Confidential Information" as "know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by [him] during [his] employment with Stryker, including, but not limited to:

> (1) prices, renewal dates and other detailed terms of customer or supplier contracts and proposals; (2) information concerning the Stryker Entities' customers and potential customers, including, but not limited to, customer or prospect lists, customer or prospect data and compilation of customer or prospect information; (3) supplier and distributor lists; (4) pricing policies, methods of delivering services and products, and marketing and sales plans or strategies; (5) product know-how, product technology and product development strategies and plans; (6) personnel or payroll records or information; (7) forecasts, budgets and other non-public financial information; and (8) expansion plans, management policies and other business strategies and policies.

(*Id*. § 2.1(B)).

41.     Given Stryker's legitimate interests in protecting its Confidential information, McNany specifically agreed not to disclose it:

> At all times during and after my employment with Stryker, I will not disclose or communicate any Confidential Information to any competitor or third party or remove materials from Stryker containing Confidential Information except as necessary for me to perform services properly for Stryker during my employment.

(*Id*. § 2.4).  Hereinafter, this provision shall be referred to as the "Non-Disclosure Provision."

42.     The Agreement also contains certain two narrowly tailored post-employment restrictive covenants, which are designed to protect Stryker's goodwill, long-standing customer relationships and Confidential Information.

43.     First, McNany agreed that during the course of his employment with Stryker and for one year after the termination of his employment for any reason, he would not "solicit or contact, directly or through others, for the purpose of competing or interfering with any part of Stryker's business . . . . any of the individual customer or prospect contacts that[McNany] established during [his] employment with Stryker.   (*Id*. § 4.1).  Hereinafter, this provision shall be referred to as the "Customer Non-Solicit Provision."

44.     Second, McNany agreed not to compete with Stryker for one year following the termination of his employment in his former Sales Territory:

11

> I will not (1) work for (as an employee, consultant, contractor, agent, or otherwise) any company that competes with Stryker Neuro/Spine/ENT in the Sales Territory for which I was responsible during the last year of my employment with Stryker, or (2) become a principal or owner of any competitor of Stryker Neuro/Spine/ENT that does business in the Sales Territory for which I was responsible during the last year of my employment with Stryker.

(*Id.* § 4.2).  Hereinafter, this provision shall be referred to as the "Non-Compete Provision."

45.     McNany recognized the reasonableness and necessity of the provisions contained in the Agreement:

> It is reasonable and necessary for the protection of the goodwill and continued business of Stryker that [McNany] abide by the covenants and agreements contained in this Agreement during and following my employment with Stryker and that Stryker will suffer irreparable injury, loss, harm, and damage if I engage in conduct prohibited in this Agreement.  My experience and abilities are such that compliance with this Agreement will not cause any undue hardship or unreasonable restriction on my ability to earn a livelihood and that the restrictions on my activities during and after employment do not prevent me from using skills in any business or activity that is not in competition with Stryker.

(*Id.* § 5.4).

46.     Further, he explicitly recognized that any breach of the Non-Disclosure, Customer Non-Solicit and Non-Compete Provisions contained in the Agreement "will cause Stryker irreparable harm that cannot be compensated adequately by an award of monetary damages," that Stryker therefore could "seek and obtain injunctive relief in addition to damages," and that Stryker was entitled to recover reasonable attorneys' fees and costs in connection with any action that Stryker "successfully brings for [his] breach or threatened breach of this Agreement."  (*Id.* § 6.1).

47.     Lastly, McNany agreed to Michigan choice of law and venue provisions and consented to the jurisdiction of this Court:

> This Agreement will be construed in accordance with and governed for all purposes by the laws of the State of Michigan. I agree and consent that any and all litigation between Stryker and me relating to this Agreement will take place

exclusively in the State of Michigan and consent to the jurisdiction of the federal and/or state courts in Michigan.

(*Id.* § 6.0).

## MCNANY IS VIOLATING HIS NON-COMPETE AND NON-SOLICIT OBLIGATIONS UNDER THE AGREEMENT.

48.    On September 15, 2015, McNany announced his intent to resign from Stryker Sales and join another medical device company.  McNany did not identify what company he was joining when he resigned even though he was obligated to do so under the terms of his Agreement.  (*See Id.* § 6.0).

49.    On September 18, 2015, Stryker wrote to McNany reminding him of his post-employment obligations under the Agreement and demanding that he identify his new employer.  (A true and correct copy of the September 18, 2015 Letter is attached as **Exhibit B**.)

50.    McNany never responded to that letter and did not inform Stryker of the identity of his new employer.

51.    On October 1, 2015, Stryker again wrote to McNany to remind him that he had failed to provide the identity of his new employer.  Stryker demanded that McNany respond with the identity of his new employer on or before October 8, 2015.  (A true and correct copy of the October 1, 2015 Letter is attached as **Exhibit C**.)

52.    Only after this second letter was sent did McNany inform Stryker that Integra was his new employer.

53.    Since joining Integra, McNany has been unfairly competing against Stryker at Stanford Medical Center by, among other things, using the Stryker name and, on information and belief, the credentials he acquired while at Stryker, to gain access to Stanford Medical Center.

54.    On October 13, 2015, after McNany had already joined Integra, McNany called on Stanford Hospital, in violation of the Non-Compete and Customer Non-Solicitation

13

Provisions of his Agreement.  On that occasion, McNany used the Stryker name and falsely represented himself as a Stryker employee in order to gain access to the surgical area on the second floor ("Stanford OR").

55.     When visiting the Stanford OR, all vendors must sign in on a dry-erase board outside the office of the Neuro-Oncology Nurse Coordinator ("Neuro Coordinator"), which is located near the command center of the OR.  The Neuro Coordinator is the liaison between Stanford Hospitals and its vendors, including Stryker NSE, and is very involved in the Sonopet Project.

56.     McNany was eavesdropping on and interrupted a meeting regarding the Sonopet Project between the Neuro Coordinator and the current Stryker NSE sales representatives charged with covering the Stanford Medical Center account.

57.     After the meeting, the current Stryker NSE sales representative questioned McNany as to why he was there and why he was signed in as a representative of Stryker. McNany quickly erased the word "Stryker" and wrote "Integra."  Before McNany erased the word Stryker, the current Stryker NSE sales representative took a picture of him posing, in scrubs with a badge, as a Stryker employee and pointing to the word "Stryker" on the dry-erase board.

58.     McNany then proceeded to question the current Stryker NSE sales representative regarding the status of the Sonopet Project.

59.     Only three days later, on October 16, 2015, McNany again violated the Non-Compete and Customer Non-Solicit Provisions to which he agreed by visiting the Stanford OR. This time McNany signed-in as an Integra rep and met with the Neuro Coordinator and another Stanford Hospitals administrator to improperly discuss updating the CUSA.  McNany attempted

14

to conceal the true purpose of the visit by writing on the vendor dry-erase board that he was there to discuss a different Integra product known as Mayfield® Headrest, which he knew did not compete with Stryker NSE.

60.     On October 23, 2015, another Stryker NSE sales representative was covering a case at Stanford Children's.  While at the hospital, a surgeon indicated that McNany had switched over to Integra and that a new version of the CUSA was coming out.  The surgeon indicated that Stanford Children's needed to do its due diligence to see if the new CUSA was superior to the Sonopet.  As a result, the surgeon said that Stanford Children's purchasing decision regarding the Sonopet would be delayed to 2016.

61.     In addition to improperly soliciting and contacting Stanford Medical Center, McNany has also contacted at least one other Stryker account in the Bay Area South Territory.

**EFFECT OF MCNANY'S EMPLOYMENT WITH INTEGRA**

62.     As a result of McNany's actions, he has interfered with and jeopardized the Sonopet Project and Stryker's sale of at least two Sonopets to Stanford Medical Center, which stand to generate not only hundreds of thousands of dollars in sales of capital equipment this year, but continued yearly sales associated with the disposables products designed to be used with that equipment.  Further, given Stanford Medical Center's standing in the medical community, Stryker has a reasonable expectation that interest in and sales of the Sonopet would increase nationwide if its Sonopet purchase by Stanford Medical Center goes through.

63.     Moreover, McNany's decision to join Integra and market competing products on its behalf poses harm far beyond threatening the Sonopet Project with Stanford Medical Center and the loss of its goodwill and customer relationships.  McNany's entire former Stryker Territory is at risk.  McNany was at Stryker NSE and in the Bay Area South Territory for almost a decade.  In this role, he developed close relationships with all of his assigned Stryker accounts

15

and had access to Stryker's confidential, proprietary and trade secret information which was integral to servicing those accounts. Integra, therefore, will have an unfair advantage with regard to all of Stryker NSE's accounts in the Territory.

64.     All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Stryker, including the loss of value of confidential and/or proprietary information, the loss of long-standing customer relationships, loss of goodwill, as well as damage to its reputation as an industry leader and its ability to successfully market its goods and services. Remedies at law are inadequate and cannot make Stryker whole.

**COUNT I**
**<u>BREACH OF CONTRACT</u>**
**Against McNany**

65.     Stryker Sales hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 64.

66.     The Agreement that McNany entered into with Stryker constitutes a valid and enforceable contract.

67.     Stryker performed all of the duties and obligations it agreed to and owed McNany under his Agreement.

68.     The Non-Compete and Customer Non-Solicit Provisions contained in the Agreement are reasonable in both scope and duration, and are necessary to protect Stryker's legitimate protectable interests in its confidential business information, as well as its business relationships, goodwill and other legitimate business interests.

69.     McNany breached and continues to breach the Non-Compete Provision by taking competitive employment with a Stryker NSE competitor.

70.     McNany breached and continues to breach the Customer Non-Solicit Provision by contacting, soliciting, attempting to solicit or in any other way, attempting to influence

16

Stryker NSE's customers, including but not limited to Stanford Medical Center, to alter or terminate their business relationship with Stryker.

71.     In addition, McNany breached and threatens to breach the Non-Disclosure Provision because he has, and it is inevitable that he will continue to use his knowledge of Stryker's confidential and proprietary information regarding the Sonopet and the Sonopet Project to encourage Stanford Medical Center to purchase new CUSAs or upgrade aging CUSAs instead of purchasing Sonopets.

72.     As a result of McNany's breaches of contract, Stryker has been irreparably injured, and it continues to face irreparable injury.  It is threatened with losing the value of its confidential and proprietary information, customer relationships, and goodwill, for which a remedy at law is inadequate.  Accordingly, McNany must be enjoined and restrained by Order of this Court.

73.     In addition, Stryker Sales seeks actual, incidental, compensatory, and consequential damages based on McNany's blatant violations of the Agreement in an amount to be determined at trial.  Stryker Sales also seeks its reasonable attorneys' fees and costs in connection with bringing this action, as allowed under Section 6.1 of his Agreement.

**COUNT II**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**Against Integra**

74.     Stryker Sales hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 64.

75.     As set forth above, the Agreement is a valid and enforceable contract.  The post-employment activity covenants, confidentiality covenants and other provisions contained in the Agreement are reasonable in scope and duration and are reasonably necessary to protect Stryker Instrument's legitimate protectable interests in its long-standing, well established and valuable

17

customer relationships and its confidential information, as well as its goodwill.

76.     Integra was fully aware of the Agreement prior to hiring McNany.

77.     Despite having knowledge of the Agreement, Integra intentionally induced, permitted or incentivized McNany to violate the post-employment and contractual obligations owing to Stryker, without justification, in an effort to employ him, interfere with and disrupt the Sonopet Project and the sale of Sonopets to Stanford Medical Center, move Stryker NSE's other customers, and  unfairly compete with Stryker.

78.     Integra's intentional interference was willful, malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting McNany to breach the Agreement, divulge Stryker's Confidential Information and otherwise violate the law.

79.     As a result of Integra's tortious interference with the Agreement, Stryker has been irreparably injured, and it continues to face irreparable injury, including but not limited to interference with the Sonopet Project.  It is threatened with losing the value of its confidential and proprietary information, competitive advantage, customer relationships, and goodwill, in amounts which may be impossible to determine and for which a remedy at law is inadequate. Accordingly, Integra must be enjoined by Order of this Court.

80.     In addition, Stryker Sales seeks actual, incidental, punitive, compensatory, and consequential damages based on Integra's conduct in an amount to be determined at trial.

## COUNT III
## <u>TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS</u>
### Against McNany and Integra

81.     Stryker Sales hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 64.

82.     Until the events giving rise to this action, Stryker maintained valid business

18

relationships, or the expectancy of business relationships, with its customers and prospective customers, including but not limited to Stanford Medical Center. Stryker also reasonably expects that the Sonopet Project will provide other opportunities throughout the United States.

83. As a former Stryker Sales employee, McNany was fully aware of these relationships and expectancies, including but not limited those arising from the Sonopet Project.

84. Because Integra is a competitor of Stryker who operates in the same marketplace and accounts as Stryker, it was and remains aware of these customer relationships and expectancies.

85. Notwithstanding their knowledge, Defendants intentionally and unjustifiably have and will interfere with Stryker's business relationships with its customers and/or prospective customers, including but not limited to Stanford Medical Center and the Sonopet Project.

86. Defendants' intentional interference was willful, malicious, unjustified and accomplished through wrongful means, including but not limited to, inducing, aiding or abetting McNany to breach the Agreement, divulge Stryker's confidential information and otherwise violate the law.

87. As a result of Defendants' tortious interference with Stryker's prospective economic advantage, including the Sonopet Project, Stryker has been irreparably injured, and it continues to face irreparable injury, including but not limited to interference with the Sonopet Project. It is threatened with losing the value of its confidential and proprietary information, competitive advantage, customer relationships, and goodwill, in amounts which may be impossible to determine and for which a remedy at law is inadequate. Accordingly, Defendants should be enjoined by Order of this Court.

88. In addition, Stryker Sales seeks actual, incidental, punitive, compensatory, and

consequential damages based on Defendants' conduct, in an amount to be determined at trial.

## COUNT IV
## UNFAIR COMPETITION
### Against McNany and Integra

89.    Stryker Sales hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 64.

90.    The above described activities constitute unfair competition by McNany and Integra to unfairly compete against Stryker, destroy goodwill and provide McNany and Integra an unfair advantage in the marketplace.

91.    McNany's false and misleading statements and use of the Stryker name, in connection with his commercial solicitation of Stanford Medical Center, misrepresented his affiliation, connection or association with Stryker for the purpose of gaining access to and soliciting business from Stanford Medical Center on behalf of Integra.

92.    Defendants' acts of unfair competition were willful, malicious and intentional.

93.    As a result of Defendants' unfair competition and false use of Stryker's name without its consent, Stryker has been irreparably injured, and it continues to face irreparable injury, including but not limited to interference with the Sonopet Project.  It is threatened with losing the value of its confidential and proprietary information, competitive advantage, customer relationships, and goodwill, in amounts which may be impossible to determine and for which a remedy at law is inadequate.  Accordingly, Defendants should be enjoined by Order of this Court.

94.    In addition, Stryker Sales seeks actual, incidental, punitive, compensatory, and consequential damages based on Defendants' conduct in an amount to be determined at trial.

21705037v.2

## PRAYER FOR RELIEF

WHEREFORE, Stryker Sales seeks judgment in its favor and an Order against

Defendants that grants the following relief:

A.      Extends the Non-Compete and Customer Non-Solicitation Provisions for all time periods in which McNany has failed to comply with his contractual obligations under the Agreement;

B.      Enjoins McNany from working as a Sales Representative in the Bay Area South Territory, including but not limited to all hospitals, medical centers and clinics affiliated with Stanford University, for one year plus the amount of time in which McNany failed to comply with his contractual obligations under the Agreement;

C.      Enjoins McNany, and all those in active concert or participation with him, from contacting, soliciting or attempting to solicit Stryker's customers and prospective customers which Stryker assigned to him in the Bay Area South Territory;

D.      Enjoins McNany and Integra, and all parties in active concert or participation with them, from utilizing the Stryker name and mark or representing affiliation with or sponsorship by Stryker in connection with the sale of products or services at any hospital, medical center or clinic in the Bay Area South Territory;

E.      Awards Stryker Sales actual, incidental, compensatory, and consequential damages to be proven at trial;

F.      Awards Stryker Sales exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

G.      Awards Stryker Sales its reasonable attorneys' fees and costs in bringing this action for breach and threatened breach of the Agreement, as agreed in Section 6.1 of the Agreement; and

H.      Orders Stryker Sales such further relief as the Court deems necessary and just.

21

**DATED: OCTOBER 28, 2015**          Respectfully submitted,

                                     **STRYKER SALES CORPORATION**


                                     By: /s/ Michael D. Wexler
                                           One of Its Attorneys

Craig H. Lubben
David J. Gass
MILLER, JOHNSON, SNELL & CUMMISKEY, P.L.C.
100 West Michigan Avenue
Suite 200
Kalamazoo, Michigan 49007
Telephone: (269) 226-2958
Facsimile:  (269) 978-2958

Michael D. Wexler
Jordan P. Vick
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, Illinois  60603
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000


*Attorneys for Plaintiff Stryker Sales Corporation*