UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STRYKER SALES
CORPORATION,

                Plaintiff,                          Case No. 1:15-cv-1110

v.                                        HON. JANET T. NEFF

JOHNNY MCNANY and INTEGRA
LIFESCIENCES CORPORATION,

                Defendants.

_____/


## OPINION

      Plaintiff Stryker Sales Corporation ("Stryker") filed this action alleging claims related to the breach of an employment non-compete agreement by Stryker's former San Francisco "Bay South" area sales representative, Defendant Johnny McNany ("McNany"), who was hired by Styker's competitor, Defendant Integra Lifesciences Corporation ("Integra"), to work in the same sales territory. The case is before the Court on Stryker's Motion for Partial Summary Judgment (ECF No.74), and Defendants' Cross-Motion for Summary Judgment (ECF No. 79). After full briefing and review, the Court concludes that oral argument is unnecessary to resolve the Motions. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the cross-motions are denied.

### I. Facts

      McNany was employed by Stryker[1] in the Bay Area South Territory of California as a sales

_____

[1]Stryker is used to refer to the various Stryker entities:  Stryker Sales, a subsidiary of Stryker Corporation; Stryker Instruments, a division of Stryker Corporation, and Stryker Neuro/Spine/Ear, Nose & Throat (NSE), a business unit of Stryker Instruments (ECF No. 78 at PageID.1350).

representative selling products and services for Stryker's Neuro/Spine/Ear, Nose & Throat (NSE) business unit for nine years, until he resigned to work for Stryker's competitor, Defendant Integra. Stryker alleges that McNany violated the terms of his Sales Representative Confidentiality, Intellectual Property, and Non-Competition Agreement with Stryker ("Stryker Agreement" or "Agreement"), which contains the following confidentiality and non-compete provisions:

**2.4** **Non-Disclosure of Confidential Information**. At all times during and after my employment with Stryker, I will not disclose or communicate any Confidential Information to any competitor or third party or remove materials from Stryker containing Confidential Information except as necessary for me to perform services properly for Stryker during my employment.

**4.1** **No Solicitation of Customers and Prospects.** For a period of one year following the termination of my employment for any reason, I will not solicit or contact, directly or through others, for the purpose of competing or interfering with any part of Stryker's business (1) any customer that purchased Stryker products at any time during the last three years of my employment with Stryker, (2) any prospect that received or requested a proposal to purchase Stryker products at any time during the last three years of my employment with Stryker, (3) any affiliate of such customer or prospect, or (4) any of the individual customer or prospect contacts that I established during my employment with Stryker.

**4.2** **No Competition with Stryker.** For a period of one year following termination of my employment for any reason, I will not (1) work for (as an employee, consultant, contractor, agent, or otherwise) any company that competes with Stryker Neuro/Spine/ENT in the Sales Territory for which I was responsible during the last year of my employment with Stryker, or (2) become a principal or owner of any competitor of Stryker Neuro/Spine/ENT that does business in the Sales Territory for which I was responsible during the last year of my employment with Stryker.

The Agreement also contains a choice-of-law and venue provision:

**6.2** **Governing Law and Venue.** This Agreement will be construed in accordance with and governed for all purposes by the laws of the State of Michigan. I agree and consent that any and all litigation between Stryker and me relating to this

2

Agreement will take place exclusively in the State of Michigan and consent to the jurisdiction of the federal and/or state courts in Michigan.

The parties have filed a comprehensive Joint Statement of Material Facts (JSMF), consisting of 191 enumerated paragraphs with supporting exhibits (ECF Nos. 76, 78), which the parties have relied upon and cited in their arguments on the cross-motions. The following facts are summarized from the JSMF.[2]

## I.    STRYKER

3.      Stryker Instruments, a division of Stryker Corporation, develops, manufactures and sells, among other things, products in the treatment of neurological, spinal and ear/nose/throat ("ENT") surgical equipment. Stryker Neuro/Spine/Ear, Nose, & Throat ("NSE") is a business unit of Stryker Instruments and produces the NSE line of products.

4.      McNany was previously employed by Stryker Sales to sell the Stryker NSE line of products, including the Sonopet.

6.      Among other things, Stryker NSE products assist doctors in performing surgeries to remove cancerous tumors. Stryker sells several different types of surgical equipment including, but not limited to, the Sonopet® Ultrasonic Aspirator System ("Sonopet"), which allows surgeons to control soft tissue and allow fine bone dissection so that the surgeon can then ablate tumors. Because the Sonopet is expensive and requires a large, up-front investment on the part of hospitals and medical centers, it is known in the industry as "capital equipment."

_____

[2]The Court's JSMF excerpts and statements of fact herein are for purposes of the summary judgment cross-motions and are not intended as a determination of the significance of particular facts or a resolution of any factual disputes in this case.

7. Stryker also sells disposable products that are designed to be used with the Sonopet, including tubing sets, tips and suction canisters.

8. In addition to the Sonopet, Stryker also sells Silverglide® bipolar forceps which are included in the NSE line of products. Bipolar forceps coagulate blood and stop bleeding during surgery.

## II. MCNANY

9. McNany is a resident of California and lives and works in the city of San Jose, California.

10. McNany was born in California and has been a California resident his entire life.

14. Defendant Johnny McNany was hired by Stryker Sales in July 2006 to sell its NSE line of products. McNany's assigned territory was in California.

15. While McNany was employed by Stryker, McNany sold Stryker NSE products in Stryker's Bay Area South Territory ("Territory") in California, which includes San Jose, Santa Clara, Palo Alto, Stanford, and other towns south of San Francisco.

16. McNany was the exclusive Stryker NSE Sales Representative assigned to the Territory and held this position in California for over nine (9) years, since the beginning of his employment with Stryker.

17. While employed by Stryker Sales, all of McNany's customers and prospective customers were located in the Territory in California.

18. McNany resigned from Stryker on September 15, 2015.

## III. INTEGRA

19. Integra is a corporation organized under the laws of Delaware with its principal place of business in New Jersey.

20. Integra is a medical device company which manufactures certain products for the NSE market that compete with certain products manufactured by Stryker.

21. McNany was hired by Integra to service its "San Francisco 2" Territory (hereinafter, "SF2") which is similar to Stryker's Bay Area South Territory but "[t]here are pieces in [the Bay Area] territory that are not in the SF2 territory."

22. Stryker's Bay Area South Territory and Integra's SF2 Territory both include the hospitals and clinics associated with Stanford University in Palo, Alto, California, including Stanford University Hospital ("Stanford Main"), Stanford Ambulatory Surgical Center, Lucile Packard Children's Hospital ("LPCH"), and the VA Palo Alto (collectively, "Stanford Medical Center"), as well as Salinas Valley Memorial Hospital ("Salinas").

23. For one and a half years prior to Integra's hiring of McNany, there was no dedicated representative for Integra's SF2 Territory, and it was instead serviced on an "as-needed basis."

24. McNany testified that Integra hired him in order to "secure [McNany's] assistance in representing a territory that had been hemorrhaging business because it hadn't been represented in [] a year and a half." He elaborated that "[the territory] was hemorrhaging business because the Mayfield headrest wasn't being represented properly. [The territory] was hemorrhaging business in many areas."

26. McNany was hired by Integra to sell its neurosurgical product line, including the CUSA and related disposables, as well as the Buzz Bipolar Forceps.

27. The CUSA is an ultrasonic aspirator that competes directly with the Sonopet.

28. There have been various versions of the CUSA, including the CUSA Excel, the CUSA Excel Plus (also referred to as CUSA 2) and the CUSA NXT.

29. Integra currently sells the CUSA Excel Plus and the CUSA NXT. The main difference between the CUSA Excel Plus and CUSA NXT is the display for the settings. The CUSA Excel Plus has an analog display while the CUSA NXT has a digital display.

30. Integra no longer sells the CUSA Excel and will stop providing service for that device as of December 31, 2016 unless the customer has an existing service contract which goes beyond that date. Integra and its representatives have referred to this process as "becoming obsolete" or "end-of-life."

31. Integra also sells Buzz® bipolar forceps which compete with Stryker Silverglide® bipolar forceps.

32. The remaining 90% of Integra products currently sold by McNany do not compete with Stryker NSE products.

## IV. MCNANY'S EMPLOYMENT WITH STRYKER

## A. McNany's Agreement with Stryker

38. The Stryker Agreement contains an "Introduction" which states:

> During my employment, I will receive and have access to materials and information regarding Stryker's medical device technologies, products, services and sales that are proprietary and confidential to Stryker. I recognize that these materials and information are an important and valuable asset to Stryker and that Stryker has a legitimate interest in protecting the confidential and proprietary nature of these materials and information.
>
> Stryker has spent and will continue to spend substantial time and money developing its medical device technologies, products, and services and training its employees on its technologies, products and services. I recognize that these technologies, products and services are an important and valuable asset to Stryker and that Stryker has a legitimate interest in protecting these technologies, products and services.

Stryker also has dedicated time and resources in developing and maintaining relationships with customers and potential customers in the sales territory that I will be assigned. During my employment with Stryker, I understand that Stryker expects me to continue to develop and maintain these relationships on its behalf. Stryker will dedicate its time and resources in assisting me to develop and maintain these relationships for Stryker. I recognize that these relationships are an important and valuable asset to Stryker and that Stryker has a legitimate interest in protecting these relationships.

39. Among other things, the Stryker Agreement contains a one year non-compete provision, a one year customer non-solicit provision, and a Michigan choice of law and forum selection clause.

40. The Stryker Agreement also contains a non-disclosure provision which applies to Stryker's confidential information, as defined in section 2.1(B) of the Stryker Agreement.

43. McNany admits that he took no steps to comply with the Non-Compete Provision and Customer Non-Solicit Provision of the Stryker Agreement.

44. Section 5.4 of the Stryker Agreement provides that:

It is reasonable and necessary for the protection of the goodwill and continued business of Stryker that [McNany] abide by the covenants and agreements contained in this Agreement during and following my employment with Stryker and that Stryker will suffer irreparable injury, loss, harm, and damage if I engage in conduct prohibited in this Agreement. My experience and abilities are such that compliance with this Agreement will not cause any undue hardship or unreasonable restriction on my ability to earn a livelihood and that the restrictions on my activities during and after employment do not prevent me from using skills in any business or activity that is not in competition with Stryker.

45. The Agreement defines Confidential Information as:

"know-how, trade secrets, and technical, business and financial information and any other non-public information in any way learned by [him] during [his] employment with Stryker, including, but not limited to: (1) prices, renewal dates and other detailed terms of customer or supplier contracts and proposals; (2) information concerning the Stryker Entities' customers and potential customers, including, but not limited to, customer or prospect lists, customer or prospect data and compilation

of customer or prospect information; (3) supplier and distributor lists; (4) pricing policies, methods of delivering services and products, and marketing and sales plans or strategies; (5) product know-how, product technology and product development strategies and plans; (6) personnel or payroll records or information; (7) forecasts, budgets and other non-public financial information; and (8) expansion plans, management policies and other business strategies and policies.

**B.      McNany's Access to Training and Confidential Information**

48.     Prior to his employment with Stryker, McNany had no experience selling medical devices and no relationships with any surgeons in the Stryker Territory.

49.     McNany received all of his initial training in the sales of medical devices from Stryker. Stryker provided McNany with the information needed to develop relationships with Stryker customers in the Stryker Territory.

50.     Stryker also provided free ongoing training on the sales of medical device products, including at Stryker's annual mid-year meetings and through online courses.

51      In his role as a Stryker Sales Representative, McNany had access to the following information regarding the Stryker NSE product line:

    a.   Product acquisition and development in the NSE line of business;

    b.   Customer retention strategies, including strategies that apply to Stanford Medical Center;

    c.   Marketing plans and promotional strategies for all NSE products, including but not limited to the Sonopet;

    d.   Pricing strategies, including terms and conditions of sales, profit margins, product pricing discounts, and bulk purchase pricing for all NSE products, including Sonopet;

    e.   Innovative and proprietary financing, leasing and payment options for all NSE products, including the Sonopet; and

    f.   Competitive strategies including those against Integra.

**D.     McNany's Performance Improvement Plan**

63.     In July 2015, McNany was put on a Performance Improvement Plan ("PIP").

64.     In the year or so leading up to the PIP, McNany had focused on selling the Sonopet and, as a result, struggled to meet his quota.

66.     The purpose of the Performance Improvement Plan was to encourage him to diversify his sales, specifically to encourage him to sell more high-speed drills.

**V.     INTEGRA'S RECRUITMENT AND HIRING OF MCNANY**

67.     A recruiter contacted McNany about an open position at Integra in late July 2015.

68.     On or about August 5, 2015, McNany met with Eduardo Cortez ("Cortez"), Integra's Regional Business Manager, Northwest Region, for an initial job interview regarding potential employment at Integra.

69.     Cortez testified that at the interview McNany told him that he had a non-compete provision in his Stryker Agreement. Integra admits that it was fully aware of the Stryker Agreement before hiring McNany.

71.     After their initial meeting, Cortez contacted Integra's legal department regarding McNany, and Cortez testified that the legal department contacted McNany "in some way."

72.     McNany forwarded the non-compete to Integra's legal department and did not recall any conversation with legal about it.

73.     Cortez received advice from Integra's legal department that he could "move forward" with McNany's interview process.

75.     McNany met Rob Thuman, Integra's Area Sales Director, West, and Tim McCarthy, Integra's Vice President of Sales, on or about September 1, 2015.

78. Integra had a sales opening in California in SF1 a different, non-competing area that was north of the SF2 Territory at the time of McNany's hire.

79. Prior to hiring McNany, Integra did not consider assigning McNany to SF1.

80. Prior to hiring McNany, Integra did not consider placing McNany in a different territory, instructing him not to call on certain customers in the SF2 Territory or instructing him to refrain from selling certain products.

82. Cortez testified that Integra had a conversation over the phone with him and McNany "around [McNany's] understanding of what is confidential and what cannot be disclosed." Cortez also testified that he had a conversation in person with Integra's legal counsel regarding the same topic.

84. McNany began working for Integra as a sales representative on September 28, 2015.

85. In connection with his employment with Integra, McNany signed a Confidentiality, Investment Disclosure and Non-Compete Agreement that defined confidential information as:

> …technical data, trade secrets, know-how, research, product or business plans, formulae, processes, products, services, projects, proposals, customer lists and customers (including, but not limited to, customers of [Integra] on whom I call or with whom I become acquainted during the term of my employment), markets, software, developments, Inventions (as defined in Section 2 below), processes, formulas, technology, designs, drawings, engineering, marketing, distribution and sales methods and systems, sales and profit figures, finances and other business information created by [McNany] or disclosed to [McNany] by [Integra], either directly or indirectly in writing, orally or by drawings or inspection of documents or other tangible property…

89. Mr. Thuman and Mr. McCarthy initially agreed to guarantee McNany's salary of $220,000 for nine months, through June 2016.

90. Integra then extended that guarantee through December 31, 2016 due to this litigation. Integra also pays McNany's legal fees in this litigation.

## VI. STANFORD AND THE SONOPET TRIALS.

97. In 2014 and 2015, McNany oversaw, on behalf of Stryker, clinical trials of the Sonopet at Stanford Main, LPCH, and the Stanford Medical Center's Ambulatory Surgical Center.

98. At the time of the trials, Stanford Main had approximately six to eight CUSA machines, at least three of which are CUSA Excel Plus systems. LPCH had two CUSA Excel systems, which Integra would stop servicing at the end of 2016. Stryker's goal was to convert these consoles to Sonopet.

101. During his employment at Stryker, McNany was usually present at one of the Stanford Medical Center facilities several times per week.

102. Stanford was the largest client assigned to McNany by Stryker in terms of cases.

103. McNany acted as the lead Stryker representative and was responsible for all aspects of the Sonopet trials up until the time of his resignation.

106. During the Stanford Sonopet Project, McNany provided surgeons with education and training regarding the Sonopet equipment.

108. During the Stanford Sonopet Project, McNany negotiated with Stanford Medical Center's administration regarding pricing for their ultimate purchase of Sonopets.

109. In June 2015, before his resignation from Stryker, McNany submitted a revised business plan wherein he indicated that he thought there was a 75% chance that both LPCH and Stanford Main would purchase Sonopets before the end of the year.

110. The trials of the Sonopet were ongoing at LPCH and Stanford Main at the time of McNany's resignation from Stryker, on September 15, 2015.

111. When a hospital trials a Sonopet, it is more likely that a purchase will be made.

## VII. MCNANY'S COMMUNICATIONS WITH STANFORD AFTER HIS RESIGNATION.

### A. Stanford Main

112. Beginning October of 2015, McNany visited representatives of Stanford Main at their operating room on behalf of Integra two to three times per week.

113. During this time, some of the visits involved attending surgeries involving the CUSA.

114. McNany admits that servicing Stanford violates the Non-Compete and Customer Non-Solicit Provisions of the Stryker Agreement, but contends that Agreement is not valid under California law.

115. On his first day working for Integra, McNany reached out to representatives of Stanford Main to communicate that he had switched positions. McNany did so because "they're the biggest account in [his] territory."

116. McNany believed he reached out to Crystal Lowe, with whom McNany had previously worked on behalf of Stryker.

117. On October 13, 2015, McNany went to the operating room at Stanford Main on behalf of Integra.

118. McNany continued to visit Stanford Main two to three times per week from October 28, 2015 to the entry of the temporary restraining order, some of which involved attending cases where the CUSA was used.

119. Stanford Main purchased two Sonopet consoles and three handpieces in 2015, out of the ten consoles that Stryker had tried to sell to Stanford Main in an effort to convert all of that facility's CUSA Excel Plus systems to the Sonopet.

120. In or around January 2016, while being serviced by McNany, Stanford Main received a proposal for service plans for four of its existing CUSA machines for $159,900. Stanford eventually accepted a proposal for similar terms.

**B.    LPCH**

122. For a year and a half before McNany joined Integra, LPCH had no dedicated Integra representative.

123. Integra trialed the CUSA NXT at LPCH during the fourth quarter of 2015, after McNany began working for Integra.

124. On October 13, 2015, McNany sent emails to Dr. Samuel Cheshier, Assistant Professor of Neurosurgery at Stanford Medical Center and, by courtesy, of Neurology at LPCH ("Dr. Cheshier") and Dr. Michael Edwards.

125. The title of both emails was Cusa vs. Sonopet and read:

I hope you were well. As you may know, I recently switched companies. I left Stryker and Am now representing Integra and the Cusa, which is ironic timing due to the trial I was running for the Sonopet. Obviously that evaluation has been going well and I'm sure your department will see it through. I'm not here to now speak negatively about the Sonopet, in fact I think it's a great product, having sold it for years. That being said, I would not have made the transition I did had I not known Integra has new Ultrasonic aspirator technology on the horizon, among other reasons. My hope is that once your Sonopet evaluation is complete, we can discuss the other Cusa options that will be available. I will also reach out to [other Stanford Medical Center surgeons] regarding this….

126. On October 20, 2015, McNany sent a substantially similar email to Dr. Gerald Grant, Associate Professor of Neurosurgery at LPCH and, by courtesy, of Neurology at Stanford Medical Center.

127. Shortly after sending the October 13, 2015 email to Dr. Edwards, McNany met with him in person. McNany "let Dr. Edwards know of the different CUSA technology" and that he "hop[ed] that he would look at the CUSA."

128. On October 28, 2015, McNany sent the following email to Mark Roesner ("Mr. Roesner") and Joh Olson ("Mr. Olson"), two administrative officials at LCPH involved in trials and purchasing:

Hello Jo [sic] and Mark. I met with Dr. Edwards today regarding a newer Cusa platform. He expressed that one of his main concerns with your current Cusa are the issues there have been with set up in the past, and it's [sic] functionality during cases. More often than not, there were issues, and little to no company representation to support. It's been roughly a year and a half since lpch has had a dedicated Integra rep, but now you do. I have the attached the brochure of the Cusa NXT system that I discussed with Dr. Edwards that I think will help alleviate most of the concerns surrounding Cusa.

1. It is a digital platform compared to your current Cusa and the Sonopet, which are both analogue.

2. It is incredibly user friendly and easy to set up. Much more so than your current Cusa and the Sonopet.

Dr. Edwards said he has spoken with you both about this and that I should contact you regarding an evaluation. Please let me know what else I can provide and what else I need to do to proceed. Thank you both and I look forward to hearing from you.

129. On the same day, Mr. Roesner emailed Mr. Olson, stating "I spoke to Dr. Edwards and after that meeting I think it's a good idea to trial the new improved CUSA."

130. Email correspondence produced in this litigation shows that thereafter, Mr. Roesner and Mr. Olson communicated with various other doctors and administrators at LPCH, including

Conor Murchison, a Category Specialist - Supply Chain representative at LPCH ("Mr. Murchison"), regarding whether they could continue to trial the Sonopet and also begin trialing the CUSA.

131. On October 29, 2015, Dr. James Kennedy Wall, Assistant Professor of Pediatric Surgery at LPCH ("Dr. Wall"), wrote "I don't mind continuing the sonopet evaluation but want to set a date for making a decision between the 2 products." Mr. Roesner responded that he "Agreed."

134. On November 4, 2015, Surita Sharma, Director of Transition & Activation at LPCH ("Ms. Sharma"), wrote to Mr. Olson and told him that the decision between purchasing a Sonopet and CUSA would have to be made by December 15, 2015.

135. On November 10, 2015, the Sonopet trial ended and Stryker removed it from LPCH.

136. In late November or early December 2015, LPCH began trialing the CUSA NXT.

137. McNany was the Integra representative who arranged to have LPCH trial the CUSA NXT.

139. On December 17, 2015, Dr. Wall responded to Ms. Sharma as follows:

I have tried to expedite the evaluation as much as possible but we simply cannot make an informed decision on moving from the CUSA to the Sonopet at this time. It is additionally complicated by the fact that multiple services use the CUSA, not just neurosurgery. All of these services will have to agree to make a complete switch. If you need a decision now, then we must plan to have the CUSA for Packard 2.0. I suspect the Neurosurgeons will want the Sonopet after the evaluation, which will then have to go to Capital Committee or be accommodated through another purchasing pathway.

Ms. Sharma responded on the same day thanking Dr. Wall for his input and stating "We will plan for the CUSA right now."

142. Mr. Murchison recently informed McNany that LPCH intends to purchase the CUSA Excel Plus.

## VIII. MCNANY'S COMMUNICATIONS WITH SALINAS AFTER HIS RESIGNATION AND DURING THE PRELIMINARY INJUNCTION.

144. Salinas currently has a CUSA Excel which Integra will no longer service as of December 31, 2016.

145. On October 27, 2015, McNany emailed Grace Swarts, a representative of Salinas, stating that "[he] left Stryker and [] moved over to Integra. Are you still taking care of Neuro? It not, who should [he] reach out to?" Swarts informed McNany, "[Michael] Aquino is covering neuro so you can contact him. I will forward him this message."

146. Prior to the entry of the Preliminary Injunction on January 29, 2016, McNany went to Salinas more than once to meet with Mr. Aquino.

147. During this time period, McNany attempted to have Salinas trial the CUSA Excel Plus.

148. McNany agrees that "go[ing] to [his] old customers" violates the Non-Compete and Customer Non-Solicit Provisions of the Stryker Agreement.

149. Prior to hiring McNany, Integra was not trialing the CUSA Excel Plus at Salinas.

155. On June 15, 2016, Salinas's trial of the Sonopet began. The first surgery at Salinas in which the Sonopet could be used was conducted on June 23, 2016.

156. On June 22, 2016, Cortez and McNany met with Mr. Aquino at Salinas. McNany and Cortez testified that the purpose of the meeting was for McNany to discuss the Mayfield Headrests and Camino Monitors with him and for Cortez to discuss Salinas's end-of-life CUSA Excel with him.

159. Salinas is now currently trialing the CUSA Excel Plus.

160. Salinas has not placed a purchase order for a Sonopet.

## IX.    MCNANY'S COMMUNICATIONS WITH OTHER HOSPITALS.

161.    Dignity Health/Dominican is a hospital which McNany serviced on behalf of Stryker prior to his resignation. The hospital is located in Stryker's Bay Area South and Integra's SF2 Territory.

162.    On October 13, 2015, McNany emailed a representative of Dignity Health/Dominican Hospital regarding a potential upgrade of that facility's CUSA.

163.    On January 13, 2016, McNany emailed a representative of Dignity Health/Dominican Hospital regarding service to that facility's CUSA machine.

## X.    MCNANY'S INTERNAL COMMUNICATIONS WITH INTEGRA REGARDING STRYKER.

164.    October 26, 2015, McNany sent an email to Cortez stating,

Hey Eddie. Still navigating my way as the new guy and not sure yet how we share field information here, but wanted to share something I heard today. I may not be breaking any news here, but coming over from Stryker, I know there was a huge push to get Sonopet on the HCA/HPG contract, ASAP. I was speaking with a Neuro Coordinator of mine at an HCA facility today, and he told me that they had recently had a conference call with several of their other facilities and that Parallon has instructed them all to stay with Cusa and not to move over to Sonopet as to stay contractually compliant. … connecting the dots, it appears Sonopet was not put on contract, at least for now anyways, and in my dealings with HCA/HPG accounts over the past decade, this is great news . . . ."

Cortez responded the same day and stated "This is exactly how you pass it on."

166.    McNany emailed Cortez on October 28, 2015 and stated:

Hey Eddie. Wanted to ask you about something that we used to do at Stryker on certain deals in order to get capital dollars a bit quicker. Most of the time, capital PO's are a challenge to get. In certain instances, when accounts can order up to a certain capital threshold, typically around $5k before having to submit the proposal for capital approval, at Stryker we were able to split a deal up into as many part numbers as needed in order to stay below the threshold and secure the deal in a timelier manner…

Cortez sent the idea to another employee at Integra that same day.

167. Cortez was shown the October 28, 2015 email during his deposition. During cross-examination at the deposition by Integra's counsel, Cortez testified that McNany's proposal was not usual to him and that "[his] own distributors that work for [him] do exactly this and always have. This is a – this is a pretty standard thing to do." When asked by Integra's counsel whether Cortez considered this to be "proprietary pricing of any kind," Cortez answered, "No. I just wish we could do it" but that Integra's technology prevents representatives from doing so.

168. On October 6, 2015, Integra's Eastern Sales Director emailed Cortez asking for information regarding "cycle times for the Stryker handpiece." Cortez responded the same day, offering to contact McNany, who he described as a "former field trainer for Stryker selling the Sonopet," for the information. Integra's Eastern Sales Director agreed that Cortez should do so.

**Integra Hires McNany.**

169. In July 2015, Integra engaged a third-party recruiter, Russ Cipriani, to identify candidates to fill the open sales representative position in the SF2 Territory. Cipriani identified and contacted several candidates, including McNany, and presented them to Integra.

171. Cortez testified that he did not consider assigning McNany to another territory with a sales opening at the time it hired McNany because that account would have required a "three-and-a-half-hour drive for [McNany] to get to his first account."

176. McNany's role at Integra is not limited to sales. He spends the majority of his time providing support services for existing Integra customers in his sales territory who own and use Integra

Neuro Sciences products, including providing training to doctors and staff, answering questions about the equipment as they arise, sitting in on surgeries when requested by a doctor to be available to provide immediate support if needed, making simple repairs, and coordinating the completion of more complicated repairs for the products.

177. One of Stryker's NSE products sales representatives testified that "he is familiar with Integra CUSA products in connection with [his] work as a Sales Representative of Stryker NSE Products."

180. Approximately ten hospitals in Integra's San Francisco 2 Territory currently own CUSA machines, including Stanford Main, which owns six. These hospitals and others, including Stanford Main, also own and use various other Integra Neuro Sciences products, such as the Mayfield Headrest and various dural sealants that are frequently utilized in highly critical neurosurgical and spinal procedures, that do not compete with Stryker NSE products.

181. When he began his employment with Integra, McNany provided support services to these existing Integra customers in connection with their existing Integra products, including Stanford Main and LPCH.

184. Cortez testified that he believed that in the sixty (60) days preceding his October 12, 2016 deposition, Dominican Hospital purchased a third party product, the Sonastar sold by Misonix that also competes with the CUSA and Sonopet.

Plaintiff's Complaint alleges four counts: Count I—Breach of Contract (against McNany); Count II—Tortious Interference with Contract (against Integra); Count III—Tortious Interference with Business Relationships (against McNany and Integra); Count IV—Unfair Competition (against McNany and Integra).

## II.  Legal Standards

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The court must consider the evidence and all reasonable inferences in favor of the nonmoving party.  *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted).

The moving party has the initial burden of showing the absence of a genuine issue of material fact.  *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010).  The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting *Anderson*, 477 U.S. at 248).

"A dispute is genuine if there is evidence 'upon which a reasonable jury could return a verdict in favor of the non-moving party.'  A factual dispute is material only if it could affect the outcome of the suit under the governing law."  *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 418 (6th Cir. 2015) (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52).

## III.  Analysis

Stryker moves for partial summary judgment in Stryker's favor on the issue of liability with respect to each of the four alleged counts:  Count I—Breach of Contract (against McNany); Count

II—Tortious Interference with Contract (against Integra); Count III—Tortious Interference with Business Relationships (against McNany and Integra); Count IV—Unfair Competition (against McNany and Integra).

## A. Choice of Law

As an initial matter, Defendants devote considerable argument to the question of the choice of law in this case, i.e., whether California or Michigan law applies. This Court previously resolved the choice-of-law matter in a bench ruling as a matter preliminary to the consideration of Plaintiff's Motion for Preliminary Injunction.

Defendants again raise the choice of law, arguing that this Court's previous resolution of the choice of law does not apply to proceedings subsequent to the Court's decision on the Motion for Preliminary Injunction. The Court finds no basis for reconsidering the choice of law in this case, having previously considered the parties' arguments, the governing legal principles, and the facts of the case, particularly the forum selection clause (providing for a Michigan forum) and the choice-of-law provision in the employment agreement at issue, which expressly provides that Michigan law applies to the parties' dispute. However, the Court provides a brief further explication of the ruling from the bench on the Motion for Preliminary Injunction.

"[W]hen sitting in diversity [this court] must apply the choice of law rules of the forum state to determine which state's laws govern the dispute." *Town of Smyrna, Tenn. v. Mun. Gas Auth. of Ga.*, 723 F.3d 640, 645 (6th Cir. 2013). "'[F]ederal courts sitting in diversity apply state substantive law and federal procedural law.'" *Performance Contracting, Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014) (citation omitted).

"Under Michigan law, 'parties may, in general, agree [in a choice-of-law provision] that all causes of action pertaining to a particular matter will be ... subject to the law of a particular jurisdiction.'" *Performance Contracting*, 750 F.3d at 618 (White, J., concurring in part) (quoting *Offerdahl v. Silverstein*, 569 N.W.2d 834, 835 (Mich. Ct. App. 1997)). "However, when parties agree to a choice-of-law provision and there is a conflict-of-law dispute, 'the approach set forth in the Restatement (Second) of Conflict of Laws' applies." *Id.* (quoting *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999)); *see also Banek Inc. v. Yogurt Ventures, U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993); *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703 (Mich. 1995).

Stryker argues that contrary to Defendants' contention, Restatement (Second) of Conflict of Laws § 187(1),[3] not § 187(2), applies because the issue involves matters that the parties could have resolved by an explicit provision in their agreement—and in fact did; thus, the law of the state chosen by the parties governs. The Court need not resolve this issue because regardless, even proceeding to the analysis under §187(2), the Court concludes that Michigan law governs.

Under the Restatement, § 187(2), a contractual choice of law provision will be binding unless either:

"(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the

---

[3]"The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(1) (1988).

state of the applicable law in the absence of an effective choice of law by the parties."

*Johnson*, 191 F.3d at 738; *see* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1988). If either exception is met, then the court will not enforce a choice-of-law provision. *See Grand Kensington, LLC v. Burger King Corp.*, 81 F. Supp. 2d 834, 837 (E.D. Mich. 2000). "'[I]t is undisputed that Michigan's public policy favors the enforcement of contractual ... choice-of-law provisions.'" *Performance Contracting*, 750 F.3d at 618 (White, J., concurring in part) (quoting *Turcheck v. Amerifund Fin., Inc.,* 725 N.W.2d 684, 688 (Mich. Ct. App. 2006)).

Here, the parties' contractual choice of law is properly enforced. Michigan clearly has a substantial relationship to the parties and the transaction, for the reasons argued by Stryker. Despite California law and policy prohibiting non-compete agreements, it cannot be said that California has a materially greater interest than Michigan in determining the dispute at issue. "Michigan has a statute specifically allowing covenants not to compete as long as they are reasonable as to duration, geographical area, and the type of employment." *See Stryker Corp. v. Ridgeway*, Nos. 1:13–CV–1066, 1:14–CV–889, 2015 WL 5682317, at *5 (W.D. Mich. Sept. 21, 2015) (citing MICH. COMP. LAWS § 445.774a(1)).

Stryker Sales is a Michigan corporation, as is Stryker Corporation, the company that manufactures the Stryker NSE products and services McNany sold. Stryker's principal place of business is in Michigan, and it has an interest in uniformity and certainty in its employee agreements throughout the country. "Because the employment relationship was rooted in Michigan, the harm would be felt in Michigan by a Michigan company." *See Ridgeway*, 2015 WL 5682317, at *6. Further, Michigan public policy favors the enforcement of contractual choice-of-law provisions. And as Stryker points out, Michigan law would apply in the absence of a Michigan choice-of-law

provision, since Michigan has the most significant relationship to this dispute under the circumstances of McNany's employment and under the rule of § 188 of the Restatement.

The Court's conclusion and bench ruling that Michigan law governs the instant dispute is further supported by the supplemental authority submitted by Plaintiff in conjunction with the instant motions (ECF No. 89), *Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383 (6th Cir. 2017). In *Stone Surgical*, the Sixth Circuit Court of Appeals upheld the Michigan choice-of-law determination by the district court under analogous circumstances.

## B. Breach of Contract (Count I)

"Under Michigan law, to prevail on a breach of contract claim a plaintiff must prove: (1) the existence of a contract, (2) the terms of the contract, (3) that the defendant breached the contract, and (4) that the breach caused the plaintiff's injury." *In re Trade Partners, Inc. Inv'rs Litig.*, No. 1:07-MD-1846, 2008 WL 3875396 at *4 (W.D. Mich. Aug. 15, 2008) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999) (applying Michigan law)).

As Stryker notes, there is no dispute as to the existence of the Non-Compete Agreement or the clauses at issue. Stryker argues that based on the undisputed facts, including McNany's admission that he breached the Agreement, Stryker is entitled to summary judgment as to liability for breach of contract. Defendants, however, argue that the restrictive covenants in the Agreement are unenforceable under Michigan law, and therefore, Stryker's claims fail as a matter of law.

Michigan law permits employment agreements not-to-compete where they protect an employer's reasonable competitive business interests and are reasonable in duration, geographic area, and the type of employment or line of business:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly

prohibits an employee from engaging in employment or a line of business after termination of employment *if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business.* To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

MICH. COMP. LAWS ANN. § 445.774a(1) (emphasis added).

"Reasonableness of a noncompete agreement is inherently fact-specific, … but '[t]he reasonableness of a noncompetition provision is a question of law when the relevant facts are undisputed.'" *Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d 861, 870-71 (Mich. 2016) (internal citation omitted) (quoting *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 544 (Mich. Ct. App. 2007)); *see also Follmer, Rudzewicz & Co., PC v. Kosco*, 362 N.W.2d 676, 683 (Mich. 1984) ("The courts thus must scrutinize such agreements and enforce them only to the extent they are reasonable."). "The party seeking enforcement bears the burden of demonstrating the validity of the agreement." *Stryker Corp. v. Ridgeway*, No. 1:13-cv-1066, 2015 WL 7308667, at *2 (W.D. Mich. Nov. 19, 2015) (citing *Coates*, 741 N.W.2d at 545).

Stryker argues that McNany's post-employment obligations are reasonable. Stryker maintains that it has a legitimate interest in protecting the customer relationships and goodwill it paid to develop through McNany, as well as confidential information, which allows Stryker to effectively compete in the marketplace. Further, the temporal and geographic restrictions contained in the Agreement are reasonable and enforceable. The geographic scope is reasonable because the Non-Solicit Provision is limited to the customers McNany previously serviced (all in the Bay Area South Territory), and the Non-Compete is explicitly limited to that territory.

Defendants argue that the Agreement is by definition unreasonable in scope, first, because the customer non-solicitation provision has no geographic scope and purports to prohibit McNany

from soliciting Stryker's current or prospective customers *anywhere* (ECF No. 81 at PageID.1783). Defendants contend that there is no evidence to support such a "robust restriction" against McNany, since Stryker would have to reasonably suspect that McNany might threaten its interests around the world—which is facially implausible (*id.* at PageID.1783-1784).

Second, the Agreement prohibits McNany from employment with any competitor of Stryker in his prior territory, "even where that role would include selling products that do not compete—in any way—with Stryker's products" (*id.* at PageID.1784). Defendants argue that there was no basis for preventing McNany from servicing or selling products that do not compete with Stryker's products. Defendants assert that Stryker has no "business interest warranting prevention of an unfair advantage, such as use of confidential information or exploitation of close customer relations" because Integra had existing relationships with the same customers as Stryker, and possessed its own extensive information regarding the customers' purchase histories, preferences, and primary personnel contacts (*id.*).

Defendants argue that third, and most fatal to the reasonableness of the Agreement, is that the restrictions are not tied to any particular trade secret, customer or potential customer or position. Thus, "[i]t does nothing but serve 'to restrain legitimate competition and job mobility,' which, 'needless to say, is not proper'" (ECF No. 81 at PageID.1785, quoting *PrimePay, LLC v. Barnes*, No. 14-11838, 2015 WL 2405702, at *38 (E.D. Mich. May 20, 2015)).

Contrary to Stryker's arguments, the Court discerns no language in the Agreement's Non-Solicit Provision limiting it to the customers McNany previously serviced (all in the Bay Area South Territory). The Non-Solicit clause provides:

> 4.1 **No Solicitation of Customers and Prospects.** For a period of one year following the termination of my employment for any reason, I will not solicit or

contact, directly or through others, for the purpose of competing or interfering with any part of Stryker's business (1) any customer that purchased Stryker products at any time during the last three years of my employment with Stryker, (2) any prospect that received or requested a proposal to purchase Stryker B products at any time during the last three years of my employment with Stryker, (3) any affiliate of such customer or prospect, or (4) any of the individual customer or prospect contacts that I established during my employment with Stryker.

Defendants' challenge to reasonableness on the grounds that it lacks sufficient territory limitations is well-taken.

Stryker is correct that the Non-Compete clause has language limiting non-competition to the Stryker sales territory for which McNany was responsible during the last year of his employment with Stryker:

4.2 **No Competition with Stryker.** For a period of one year following termination of my employment for any reason, I will not (1) work for (as an employee, consultant, contractor, agent, or otherwise) any company that competes with Stryker Neuro/Spine/ENT in the Sales Territory for which I was responsible during the last year of my employment with Stryker, or (2) become a principal or owner of any competitor of Stryker Neuro/Spine/ENT that does business in the Sales Territory for which I was responsible during the last year of my employment with Stryker.

However, Defendants argue that the limitation may nevertheless be unreasonable. As Defendants point out, the Non-Compete appears to preclude McNany from working for a competitor even where that role would involve selling products that do not compete—in any way—with Stryker's products.

The Court concludes that whether the Stryker Agreement is valid and enforceable cannot be determined as a matter of law. It is undisputed that this case involves circumstances in which both Stryker and Integra have existing relationships with the same health care facility customers, but also have competing as well as non-competing products. Although the Non-Solicit and Non-Compete clauses contain clear durational limitations, whether the Agreement protects Stryker's reasonable competitive business interests and is reasonable in duration, geographic area, and the type of

employment or line of business implicates fact-specific questions not properly resolved on summary judgment. "'[A] restrictive covenant must be reasonable as between the parties, and it must not be specially injurious to the public.'" *Coates*, 741 N.W.2d at 545 (quoting *St. Clair Med., P.C. v. Borgiel*, 715 N.W.2d 914, 919 (Mich. Ct. App. 2006)).

"Because the prohibition on all competition is in restraint of trade, an employer's business interest justifying a restrictive covenant must be greater than merely preventing competition." *St. Clair Med., P.C.*, 715 N.W.2d at 919 (addressing restrictive covenants in a medical setting). Here, the reasonableness of the restrictive covenants requires further scrutiny in light of the unique facts of this case and the nature of the parties' competing business with respect to the hospital and patient interests they serve. The parties' cross-motions for summary judgment of the breach-of-contract claim are properly denied.

### C. Tortious Interference Claims (Counts II and III)

Stryker argues that it is entitled to summary judgment as to liability on the Tortious Interference with Contract claim against Integra (Count II) and the Tortious Interference with Business Relationships claim against McNany and Integra (Count III). Defendants disagree and argue that even if the Court finds the Agreement Enforceable (or "blue-pencils" the Agreement), the tort claims fail as a matter of law.

#### 1. *Tortious Interference with Contract claim against Integra*

To prove a claim for tortious interference with contract under Michigan law, a plaintiff must show (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant. *Via The Web Designs, L.L.C. v. Beauticontrol Cosmetics, Inc.*, 148

F. App'x 483, 487 (6th Cir. 2005); *Badiee v. Brighton Area Sch.*, 695 N.W.2d 521, 539 (Mich. Ct. App. 2005); *Mahrle v. Danke*, 549 N.W.2d 56, 60 (Mich. Ct. App. 1996).

Stryker asserts, as above, that McNany admits that the Stryker Ageement existed and that he breached it; thus, the only issue is whether Integra unjustifiably instigated McNany's breach. However, as the Court has determined, questions of fact exist concerning the validity and enforceability of the contract, and thus, whether Stryker can establish a breach of contract. Accordingly, Stryker is not entitled to summary judgment on the issue of liability of the tortious interference of contract claim against Integra.

For the same reasons, Defendants are not entitled to summary judgment on this claim. First, given the open questions concerning the existence of a contract and breach, the first two elements of tortious interference claim are at issue. Second, even if the Agreement were enforceable and McNany breached the Agreement, contrary to Integra's argument, factual disputes exist concerning the third element—whether there was an unjustified instigation of the breach by Integra.

"The third element [of a tortious interference claim] requires the plaintiff to demonstrate that the third party was induced either to breach the contract or to break off the prospective business relationship by an intentional act that is either: (1) wrongful per se; or (2) lawful, but done with malice and unjustified in law." *Via The Web Designs*, 148 F. App'x at 487; *see also Tata Consultancy Servs., a Div. of Tata Sons Ltd. v. Sys. Int'l, Inc.*, 31 F.3d 416, 422 (6th Cir. 1994) ("'[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.'" (quotations and citations omitted)).

As Integra notes, the courts have recognized that to establish that a lawful act was done with malice and without justification, the plaintiff "must 'demonstrate, with specificity, affirmative acts by [the defendant] which corroborate the improper motive of the interference" (*see* ECF No. 81 at PageID.1792; *Boone v. Seterus, Inc.*, No. 13-CV-13457, 2014 WL 1460984, at *3 (E.D. Mich. Apr. 15, 2014)). Further, "'[w]hen a defendant's acts are motivated by legitimate business reasons, it does not act with malice and a lack of justification.'" (ECF No. 81 at PageID.1792, quoting *Elias v. Fed. Home Loan Mortg. Corp.*, 581 F. App'x 461, 464 (6th Cir. 2014) (internal quotations omitted)). *See Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003) (same); *see also Urban Assocs., Inc. v. Standex Elecs., Inc.*, 216 F. App'x 495, 514 (6th Cir. 2007) ("The weight of Michigan authority holds that when the defendant's actions are motivated by legitimate business reasons, its actions do not constitute improper motive or interference.").[4]

Integra argues that Stryker cannot establish such unlawful purpose. Integra notes that here, unlike in the cases cited by Stryker, Integra did not lure McNany away from a fixed-term agreement to unfairly compete with Stryker; instead a third-party recruiter contacted McNany, who decided that the time for a new opportunity was ripe given that Stryker recently placed him on a "performance improvement plan" (PIP). And McNany spoke with Integra's legal department to ensure compliance with confidentiality obligations. Thus, not only was there no malice in Integra's actions, but "there

---

[4]*But see Urban Assocs.*, 216 F. App'x at 514 n.14 (noting contrary and conflicting Michigan authority, *e.g.*, *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451 (Mich. Ct. App. 1989) ("declining to hold that a defendant whose alleged tortious interference was motivated by legitimate business interests was *necessarily* free of liability. In addition to motive, that panel of the Michigan Court of Appeals advised consideration of these factors: (1) the nature of the defendant's conduct, (2) the nature of the plaintiff's contractual interest, (3) the social utility of the respective interests [sic] of the plaintiff and the defendant, and (4) the proximity of the defendant's conduct with the interference." *Id.* at 462-63 (citing 4 Restatement of Torts 2d § 767 at pp. 26-27 and cmts. thereto)).

was justification in the law because noncompetes are unlawful in California by statute" (ECF No. 81 at PageID.1793).

However, Stryker, reasonably, characterizes the rules and the record differently. Stryker asserts: "An 'unjustified instigation' occurs where a competitor acts 'solely in the interest of feathering its own economic nest at the expense of a competitor'" (ECF No. 77 at PageID.1335, quoting *Tata Consultancy Servs.*, 31 F.3d at 425). Further, "[m]alice in the sense of 'hatred or ill-will' is not required – the wrongful act of inducing a breach of contract is sufficient" (*id.*). Stryker argues that Integra admits that it knew of the Stryker Agreement before hiring McNany, and nonetheles, Integra's legal department advised Integra to go forward with recruiting McNany in a directly competing position, and Integra "sweeten[ed] the pot" by guaranteeing McNany a $220,000 salary plus commissions for eight months (*id.* at PageID.1335-1336). Further, Integra could have easily, but did not, place McNany in a different territory, instruct him to refrain from soliciting certain Stryker customers, or restrict him from selling the CUSA and related products (while leaving him free to sell the other non-competing 90% of Integra's product line). Stryker argues that the evidence makes clear that Integra consciously and unjustifiably interfered with the Stryker Agreement: "Integra took a calculated risk in hiring McNany and, as admitted, did so in order to 'secure [McNany's] assistance in representing a territory that had been hemorrhaging business because it hadn't been represented in a year and a half.'" (ECF No. 77 at PageID.1336).

The wealth of disputed circumstances, including motive, on the record before the Court precludes a ruling as a matter of law on the third element of the tortious interference claim against Integra. This is particularly so given the unique circumstance that Stryker and Integra are direct competitors in selling alternative ultrasonic aspirators, the CUSA and the Sonopet, to the same

hospitals/health care facilities.  The cross-motions for summary judgment of this claim are properly denied.

   2. *Tortious Interference with Business Relationships claim against McNany and Integra*

   "To establish tortious interference with a business relationship, a plaintiff must show: (1) a valid business relationship or expectancy; (2) that the defendant was aware of the relationship or expectancy; (3) that the defendant's intentional interference induced or caused a breach or termination of the relationship or expectancy; and (4) damage to the plaintiff."  *Via The Web Designs*, 148 F. App'x at 487 (citing *Badiee*, 695 N.W.2d at 538).

   Stryker likewise seeks partial summary judgment of this claim, on the issue of liability. Stryker argues that the undisputed evidence and admissions show that Stryker had a valid expectancy with regard to its expected sale of Sonopets and related disposables to Stanford Main, LPCH and Salinas and, that these facilities were trialing Sonopets, which makes a purchase more likely.  Stryker cites a number of circumstances, based on the JSMF, in support of its arguments. For instance, McNany himself believed there was a 75% likelihood that Stanford Main and LPCH would purchase the Sonopet by the end of 2015.  Additionally, Stryker's likelihood of making a sale to these hospitals was increased by the fact that Integra had no dedicated representative at these accounts prior to hiring McNany and was making no efforts to sell newer versions of the CUSA to them.   And internal emails from LPCH and Salinas show that, at the time of Defendants' interference, those facilities were intent on making a purchasing decision.  Because LPCH and Salinas had CUSA Excels that were being obsoleted, they needed to make a purchasing decision to ensure that they would have an operational and serviceable ultrasonic aspirator on hand for surgeries.  One doctor at LPCH also indicated that neurosurgeons preferred the Sonopet.

Stryker argues therefore, there can be no doubt that Defendants intentionally and successfully interfered with the sales process at Stanford Main, LPCH and Salinas. The undisputed evidence shows that Defendants targeted these hospitals because they knew they were trialing Sonopets to replace their aging or end-of-life CUSAs, and Defendants wanted to take action so that Integra would stop "hemorrhaging business." As a result, Stanford Main decided to extend the life of its existing CUSAs by entering into service agreements rather than buying more Sonopets. LPCH stopped trialing the Sonopet and made a decision to purchase the CUSA Excel Plus to replace its end-of-life CUSA Excel. And Salinas began trialing the CUSA Excel Plus and did not respond to Stryker's Sonopet Proposal even though it previously indicated that it "urgently" needed to make a purchasing decision.

Defendants dispute these circumstances and their significance with respect to any claim of tortious interference. Defendants argue that Stryker cannot demonstrate a valid expectancy of sales, an intentional interference, or resulting damages to establish this claim. Defendants cite a number of opposing circumstances, to support that Defendants' actions were motivated by legitimate business reasons, not that they interfered with Stryker's business with malicious intent or that their actions were inherently wrongful or unlawful.

The Court agrees that the circumstances cited by Stryker, even viewing the record and reasonable inferences in Stryker's favor, lack certainty such that they do not support summary judgment on the issue of liability. As Defendants point out, although Stryker claims that Defendants intentionally targeted these hospitals because they knew they were trialing Sonopets, the hospitals at issue already owned CUSAs, which Integra serviced on an ongoing basis. Stryker's own recognition that Stanford Main purchased a service contract to extend the life of its existing CUSAs

arguably provides a legitimate business reason that Defendants sought to sell CUSA products to the hospitals; Stanford Main, LPCH, and Salinas hospitals already owned CUSAs that were approaching end-of-life, which meant support would expire shortly and, without the back-up of a new service contract, would pose a risk to Stanford Main's patients during surgeries. Moreover, Stanford Main purchased two Sonopet consoles and three handpieces from Stryker in 2015, after McNany joined Integra.

Defendants also point to further infirmities in Stryker's assertions and conclusions, regarding Defendants' business circumstances and the hospitals' intentions and purchases. Defendants argue that "Integra had every right to service each hospital and communicate and meet with its existing contacts and, in some cases, existing customers," and "Stryker should not be allowed to further manipulate the law to chill free-market competition" (ECF No. 81 at PageID.1797).

While Defendants' citation to the evidence and argument is persuasive in negating Stryker's entitlement to summary judgment, it is not conclusive to negate this claim altogether. Where, as here, both Stryker and Integra had existing, ongoing competing business relationships with the hospitals, and McNany served both parties' competing interests by transferring the benefits of his experience and expertise from Stryker to Integra, despite the potential breach of his Stryker Agreement, the ultimate question of interference is one for the trier of fact. Thus, Defendants' motion for summary judgment of this tortious interference claim is denied.

### D. Unfair Competition (Count IV)

Michigan law "prohibits a party from engaging in unfair and unethical trade practices that are harmful to his or her competitors or to the general public." *Dura Glob. Techs., Inc. v. Magna Donnelly Corp.*, No. 07-10945, 2009 WL 3032594, at *4 (E.D. Mich. Sept. 18, 2009); *see also Dana*

*Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10-cv-450, 2013 WL 4498993, at *31 (W.D. Mich. Aug. 19, 2013) ("'[U]nfair competition prohibits unfair and unethical trade practices that are harmful to one's competitors or to the general public.'" (internal quotations and citations omitted)).

As with the tortious interference with business relationships claim, Styker's claim that Defendants unfairly and unethically competed with Stryker must be established under the business circumstances presented. *See Dana Ltd.*, 2013 WL 4498993, at *31 ("Each unfair competition case 'is determined upon its own facts and relief is based upon the principles of common business integrity'" (citation omitted)). Stryker argues that the undisputed facts show that Defendants did not act in accordance with principles of common business integrity because McNany was aware of his obligations but chose not to abide by them, and Integra too was aware of McNany's restrictions under the Agreement, but nonetheless hired him into a position that directly violated the terms of that Agreement. Stryker notes, as above, that despite having other options in terms of sales representatives to hire to fill the SF2 Territory, Integra hired McNany, and despite having another California territory that he could have serviced, Integra placed McNany in the exact same territory he serviced for Stryker. Further, despite the fact that 90% of its product catalogue did not compete with the products McNany sold for Stryker, Integra had McNany sell the 10% of products that would violate the Agreement. Stryker contends all of these actions were unfair and injured Stryker.

Stryker's liability theory reflects the uncertainty in these underlying contentions: "Rather than hiring a sales representative unencumbered by post-employment restrictions, Integra targeted McNany so that it could immediately reap the benefits of his expertise in selling ultrasonic aspirators – expertise fostered by Stryker – and to usurp the goodwill Stryker had developed in the Bay Area South Territory – a territory that Integra had previously ignored for years and allowed to

35

'hemorrhage business'" (ECF No. 77 at PageID.1338). To move from theory to proof will require the resolution of the many factual disputes and required inferences in Stryker's favor, and thus, is a matter for the jury to decide. Stryker is not entitled to partial summary judgment on this claim.

Likewise, the evidence is not conclusive in Defendants' favor on this claim. Defendants argue that there is no evidence of deception or unethical practice. *See Veteran Med. Prods., Inc. v. Bionix Dev. Corp.*, No. 1:05-cv-655, 2009 WL 891724, at *7 (W.D. Mich. Mar. 31, 2009) ("The gist of an unfair competition case is that the public is so misled that the plaintiff loses some trade by reason of the defendant's deception."). Defendants note that Integra used a third-party recruiter to find a new representative for its SF2 Territory, and if it had not been McNany, Integra would have hired another individual, who also would have relied on Integra's institutional knowledge and hospital contacts to service the hospitals in that region. Moreover, there is no evidence that the hospital representatives were "misled" by either McNany or Integra. "When McNany contacted hospitals as an Integra employee, he made clear that he no longer represented Stryker and reinforced that '[he was] not here to now speak negatively about the Sonopet'" (ECF No. 81 at PageID.1799). Thus, Defendants argue that the evidence shows nothing more than Integra's legitimate efforts to compete for business.

However, given Defendants' roles in using McNany to service and sell the same competing product to the same clients McNany serviced for Stryker, the evidence is not "so one-sided" that Defendants prevail as a matter of law. *See Back*, 694 F.3d at 575. Defendants' motion for summary judgment of this claim is properly denied.

## IV. Conclusion

Given the material factual disputes underlying the claims at issue, neither Stryker nor Defendants are entitled to summary judgment. The cross-motions are accordingly denied. An Order consistent with this Opinion will be entered.


Dated: August 31, 2017                                          /s/ Janet T. Neff
                                                                JANET T. NEFF
                                                                United States District Judge